IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MANUEL CASTANDEDA, ROSA                     Case No. 6:23-cv-1803-MC
CASTANEDA, and BETTER WAY, LLC,
An Oregon limited liability company,        OPINION AND ORDER

        Plaintiffs,

  v.

CITY OF DEPOE BAY, a municipality and
political subdivision of the State of Oregon,

        Defendant.

_____

**MCSHANE, Judge:**

      Plaintiffs Manuel and Rosa Castaneda, along with Better Way, LLC, bring this action against Defendant City of Depoe Bay alleging takings, due process, and discrimination violations. Plaintiffs sought to build a residence on an oceanfront lot in Depoe Bay and allege that, absent building variances Plaintiffs sought from the Defendant— variances they contend the City has routinely granted in comparable circumstances over the past decade— the property is virtually unbuildable and essentially worthless.

      Defendant moved for summary judgment, asserting that the Castanedas lack standing and that Better Way's claims fail on the merits. The Court finds that the Castanedas have standing and that a reasonable juror could conclude the City's denial of Plaintiffs' application was arbitrary, capricious, and irrational. Accordingly, Defendant's Motion for Summary Judgment (ECF No. 47) is DENIED.

1 – OPINION AND ORDER

## BACKGROUND

Manuel and Rosa Castaneda were each born in Mexico. After immigrating to the United States as children, they met in 1985 and married in 1993. Rosa Castaneda Decl. ¶ 6; ECF No. 55. Rosa because a United States citizen in 1994. *Id.* ¶ 4. Manuel became a United States citizen the following year. Manuel Castaneda Decl. ¶ 5; ECF No. 54.

"After years of hard work, [Manuel] had sufficient funds to purchase a lawn mower and started a landscaping business named Pro Landscape, Inc." *Id.* ¶ 6. He grew the business, passed the state contractor's exam, and worked in landscape construction. *Id.* ¶ 7. Manuel later focused the business on soil stability and formed PLI Systems, Inc. *Id.* ¶ 9.

In 2004, the Castanedas purchased a residential oceanfront lot (the "Property") in Depoe Bay with the intention to one day build their dream home on the lot. When they purchased the Property, the Castanedas did not know of any restrictions on the lot. They also were unaware that at that time, the city "was in the process of enacting stricter oceanfront development standards." *Id.* ¶ 11. A few years later, Manuel first learned that oceanfront lots were subject to setback restrictions. *Id.* Manuel spoke with then-City Planner Larry Lewis "who told me that variances were routinely granted, and it would not be a problem as long as our home was in line with the adjacent homes." *Id.* In 2020, the Castanedas transferred the Property to Better Way. *Id.* ¶ 12.

In 2021, Better Way applied to build a home on the Property with several front yard ("FY") and Area of Visual Concern ("AVC") setbacks and exceptions. Wollenburg Decl. ¶ 7; ECF No. 48. After the Planning Commission denied that application, Better Way submitted a second application in 2023. Wollenburg Decl. ¶ 12. The 2023 application reduced the square footage of the proposed home by 25%. Franco Decl. Ex. 6, 4; ECF No. 56. Yet again, the Planning Commission denied the 2023 application and the City Council denied Plaintiffs' appeal.

2 – OPINION AND ORDER

Plaintiffs filed this action bringing five claims for relief: (1) a taking in violation of the Fifth Amendment to the United States Constitution and (2) Article I, Section 18 of the Oregon Constitution; (3) inverse condemnation; (4) violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution; and (5) violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Defendants move for summary judgment on all five claims.

## **STANDARDS**

The court must grant summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting Fed. R. Civ. P. 56(e)). The mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. 242, 247–48. Rather, the non-moving party must proffer evidence that could reasonably affect the outcome of the suit. *Miller*, 454 F.3d at 988.

/ / / /

/ / / /

/ / / /

3 – OPINION AND ORDER

**DISCUSSION**

I.    **Standing**

Defendant argues that because Better Way owns the Property, the Castanedas lack standing. Generally, "a shareholder lacks standing to bring a section 1983 action on behalf of the corporation in which he owns shares." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1318 (9th Cir. 1989). "Similarly, it is not sufficient for the plaintiff to assert a personal economic injury resulting from a wrong to the corporation." *Id.* A shareholder, however, has standing to bring claims stemming from direct injuries independent of any injury to the corporation. *Id.*

In *Soranno*, the individual Plaintiffs were sole owners and shareholders of a corporation that sold petroleum products. After publicly criticizing a regulatory agency, the Sorannos alleged that the agency retaliated by suspending the company's permits. The Sorannos' brought due process and retaliation claims individually and on behalf of the corporation. The Ninth Circuit noted that any act taken in retaliation of Soranno's rights under the First Amendment "clearly alleges a direct and independent personal wrong." Because the rights at issue belonged to Soranno, not the corporation, "Soranno clearly has standing to contest the deprivation of those rights." *Id.* at 1319. Next, the court concluded that the mere fact that the Sorannos' non-economic "injuries arose from the same conduct as the corporate injuries does not preclude a finding of direct and independent injury to individual plaintiffs for standing purposes." *Id.* This is consistent with Ninth Circuit caselaw holding that a shareholder has standing "when he or she has been 'injured directly and independently from the corporation.'" *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 (9th Cir. 2002) (quoting *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983)). This is so even if the injuries to the corporation and individual stem from the same conduct. *Id.*

4 – OPINION AND ORDER

Here, as in *Soranno*, the Castanedas have standing because their non-economic injuries are distinct from any economic damages that may have been incurred by Better Way. For example, Plaintiffs' Equal Protection claims allege that Defendant denied Better Way's application because the Castanedas are Hispanic. Those injuries, along with any potential non-economic damages from being denied the opportunity to build their family home, are distinct from any purely economic injuries to Better Way. And while the Plaintiffs may share identical economic damages from the takings claims, the Court will prohibit any double recovery via instructions or post-trial motions.

## II.    <u>Takings</u>

The Fifth Amendment prohibits the taking of private property "for public use, without just compensation." *Laurel Park Cmty, LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012). One example of a per se taking is "a deprivation of all economically beneficial use of the property[.]" *Id.* The Supreme Court, however, has long recognized the lawfulness of state and local zoning ordinances and regulations limiting the use of property. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 126–27 (1978) (listing cases not found to be takings including: law prohibiting operation of brickyard because its presence "was inconsistent with neighboring uses"; order to close gold mine to preserve skilled workers for other jobs; laws prohibiting the sale of liquor; order prohibiting the "most beneficial use of the property" that impacted a particular individual). However, if regulations are not at least "reasonably necessary to the effectuation of a substantial public policy, the regulation may constitute a taking." *Id.* at 127. A taking may also occur if the regulation "makes the property wholly useless." *Id.* Additionally, zoning laws or regulations may constitute a taking if the regulations go "too far." *Laurel Park*, 698 F.3d at 1188.

In determining whether a regulation goes "too far" and constitutes a taking, courts consider: "(1) the economic impact of the regulation on the claimant" and (2) "the extent to which the

5 – OPINION AND ORDER

regulation has interfered with distinct investment backed expectations." *Id.* Additionally, "the character of the governmental action may be relevant in discerning whether a taking has occurred." *Id.* (quoting *Penn Central*, 438 U.S. at 538–39) (cleaned up). Regarding the first prong, while there is no bright-line, minimum required economic impact needed to support a taking, "a small decrease in value, for only one affected property, falls comfortably within the range of permissible land-use regulations that fall short of a constitutional taking." *Id* at 1189.

Here, the parties agree that due to setbacks and the AVC, the buildable portion of the Property absent a variance or exception is approximately 776 square feet. Stuart Emmons, Plaintiffs' architectural expert, opines that due to the restrictions, "no reasonable home could be constructed on th[e] Property without exceptions or variances to those setback requirements."[1] Emmons Decl. ¶ 4; ECF No. 52. Emmons concluded:

> Without any exceptions or variances to the setback requirements, the buildable area of Plaintiffs' lot is effectively 776 square feet. It is not feasible to build any reasonable code-compliant house on that amount of buildable area. In fact, the buildable area is so small that it cannot even accommodate a garage or carport that allowed a code compliant parking space. 776 square feet refers to the exterior buildable area, which would likely leave less than 500 total interior square feet after accounting for exterior wall thickness, plumbing, electrical, and HVAC.

*Id.* ¶ 5 (internal citation omitted).

"In addition, given the expense of the geotechnical requirements to build on an oceanfront lot such as the Castanedas' lot, the cost of building even a 'tiny home' on the lot is not economically viable." *Id.* ¶ 6. Due to the residential zoning "and the miniscule portion of land not

---

[1] Defendant does not—nor, apparently, could it— challenge Emmons's ability to provide an expert opinion on these topics. Emmons, a Fellow of the American Institute of Architects with a Masters of Architecture from Harvard University's Graduate School of Design, has 35 years of experience as an architect. Emmons Decl. Ex. 1, 1. Emmons has extensive experience working on new or remodeled residential projects "in jurisdictions that had zoning and land use regulations similar to the City of Depoe Bay." Emmons has extensive experience writing successful applications for variances on residential projects. Emmons has "designed institutional government and commercial projects, including the main lecture hall at the University of Oregon College of Design (Fritz Lecture Hall), other classrooms on campus, and the first U of O Architecture School space in Portland." *Id.*

consumed by setbacks," Emmons believes "that the property has no economically viable use to the Castanedas." *Id.* ¶ 7. Manuel Castaneda agrees, stating "that the Property is worthless, and of no economic use to us, because we cannot build on it, and if we were to try to sell it, we would need to disclose that it is an unbuildable lot because of what the City has done." Manuel Decl. ¶ 13. At this stage, Plaintiffs plausibly suggest that the Property is essentially worthless.

Turning to the second prong, the Castanedas bought the Property with the hope of building a home on it. Even when the Castanedas later learned about the setback restrictions, their dream of building a home on the Property was a reasonable one. Manuel "spoke with the City Planner at that time, Larry Lewis, who told me that variances were routinely granted, and it would not be a problem as long as our home was in line with the adjacent homes." Manuel Decl. ¶ 11. Kit Fox, Defendant's City Planner, concluded that the proposed home in Better Way's 2023 application was in line with nearby homes. Plaintiff's expert reached the same conclusion. Plaintiffs' distinct investment-backed expectations support a takings claim.

Turning to the character of the governmental action, Plaintiffs do not raise a facial challenge to Defendant's zoning ordinances. Instead, Plaintiffs take issue with how Defendant applied those ordinances to their application to build a home. Where, as here, "a property owner challenges the application of a zoning ordinance to his property, the judicial inquiry . . . will include consideration of the treatment of similar parcels." *Penn Cent.*, 438 U.S. at 133 n. 29. Plaintiffs provide a plethora of evidence supporting their argument that Defendant granted variances and exceptions to many, if not all, similar properties, denying only Plaintiffs' requested variances. Plaintiffs' expert opined that the footprint of Plaintiffs' proposed home is no different than nearby homes. The homes directly adjacent to the Property have FY variances greater than the 10-foot variance sought by Plaintiffs. Additionally, Plaintiffs' proposed home is not any closer to the bluffs

7 – OPINION AND ORDER

than the adjacent homes. And, as discussed in greater detail below, Defendant's City Planner agreed with all of the above. Plaintiffs have presented more than sufficient evidence which, viewed in the light most favorable to them, indicates that Defendant treated Plaintiffs differently than every other similar applicant over the past decade.

### III.    <u>Equal Protection</u>

"An individual singled out for differential treatment in an 'irrational and wholly arbitrary' manner may bring a substantive due process or 'class of one' equal protection claim." *David Hill Dev., LLC v. City of Forest Grove*, 2012 WL 5381555, at *19 (D. Or. 2012). "In order to claim an Equal Protection violation in a class of one case, plaintiff must establish defendant intentionally, and without rational basis, treated plaintiff differently from others similarly situated."[2] *Id.* A plaintiff must establish more than "selective enforcement of valid laws" to demonstrate that a defendant acted in an arbitrary or irrational manner. *Id.* "To establish an Equal Protection claim, the asserted rational basis for selectively enforcing the law must also be a pretext for an impermissible motive. Conversely, there is no rational basis for state action that is malicious, irrational or plainly arbitrary." *Id.* (internal quotations and citations omitted). "Thus, a plaintiff may rebut a proffered rational basis on the grounds that the rational basis is objectively false, or by proving defendant acted with an improper motive." *Id.* (internal quotations omitted).

For the purpose of summary judgment, Plaintiffs have established that Defendant acted in an arbitrary and capricious manner in denying Plaintiffs' 2023 application. As noted above,

---

[2] Plaintiffs argue that because the Constitution prohibits the taking of property without just compensation, "strict scrutiny should apply because Plaintiffs have alleged the violation of a fundamental right, the illegal deprivation of their property under the Fifth Amendment[.]" Resp. 37. This argument ignores a veritable mountain of caselaw where courts considering due process claims based on the failure to issue building permits ask whether there is any rational basis behind the decision. *See Bateson*, 857 F.2d at 1305 (noting 20 years of Supreme Court precedent applying arbitrary and capricious standard to zoning challenges).

Plaintiffs filed their first application to build a home on the Property in 2021. Depoe Bay "maintains a planning commission which considers and makes decisions on behalf of the city council regarding various types of land use and planning applications." Wollenburg Decl. ¶ 4. The Depoe Bay City Council appoints members to the Planning Commission. Wollenburg Decl. ¶ 5. While Better Way's 2021 application was pending before the Planning Commission, City Councilor Fran Recht submitted a letter opposing the application. Wollenburg Decl. ¶ 8. Recht's letter stated:

> Dear Planning Commissioners:
>
> The application for a variances [sic] by Better Way LLC for a variance of the Coastal Setback for Erosion and Coastal Setback for Visual Concerns must be denied because the criteria that requires the variances to not be self imposed and the minimum variance necessary to alleviate the hardship (Criteria #4 below) cannot be met.
>
> The applicant has created self-imposed hardships for both coastal setbacks in proposing such a large home as he can build a more modest home so he wouldn't need as large of variances Therefore the criteria that the hardship not be self-imposed and be the minimum variance necessary cannot be complied with.
>
> Therefore, the application must be denied because the variance standards say that require [sic] ALL the criteria to be met. The planning commission should deny the application and direct staff to prepare findings in support of your decision.

Wollenburg Decl. Ex. A.

As directed by Councilor Recht, the Planning Commission denied Better Way's 2021 application. Wollenburg Decl. ¶ 10. Defendant argues that Councilor Recht sent the letter to the Planning Commission "in her capacity as a private citizen." Wollenburg Decl. ¶ 8. While it is perhaps conceivable that Defendant could advance this argument at trial, at summary judgment, viewing all inferences in the light most favorable to Plaintiffs, the Court views the letter in a different way. At this stage, Councilor Recht—who appoints members to the Planning Commissioner in her role on the City Council—ordered the Commission to deny the application.

In May 2022, after the Planning Commission denied Better Way's first application, City Councilor Lindsy Bedingfield sent an email titled "Spite Fence" to City Planner Kit Fox, Depoe Bay Mayor Kathy Short, and City Councilor Fran Recht. Franco Decl. Ex. 8. The email provided a picture of a fence the Castanedas built on the Property after the Planning Commission denied their application. Bedingfield wrote: I would like to make a formal complaint about a fence that was recently constructed in violation of Depoe Bay Zoning Regulations. The fence exceeds the height limits allowed in the front yard setback. . . . Let me know if I need to physically sign the complaint." *Id.* The following day, Bedingfield filled out a COMPLAINT FORM, again noting her opinion that "A fence was recently constructed on North Point that exceeds the height limitation allowed in a front yard setback area." *Id.* Ex. 8. A few days later, City Planner Fox visited the Property and provided a report to the City Council that, contrary to Bedingfield's complaints, the fence did not exceed height requirements or violate any front yard setback requirements. *Id.* Ex. 11. Fox did, however, find that the fence at the back of the property (closest to the ocean) "may encroach" into the AVC and would need a Coastal Shorelands permit. *Id.* Fox testified that in his 2.5 years working for Defendant, this was the only complaint about a fence that he received.[3] Franco Decl. Ex. 20, 6.

Eventually, Plaintiffs submitted a 2023 application to build a home on the Property. This proposed home was approximately 25% smaller than that proposed in Plaintiffs' 2021 application. City Planner Fox provided the Planning Commission with a 15-page Staff Report containing his

---

[3] Plaintiffs provided evidence indicating that they built the fence not out of "spite," but merely to protect the Property. Pictures in the record indicate that many in the area used the Property as a place to park numerous vehicles "in total disregard of [the Castanedas'] ownership rights." Franco Decl. Ex. 5 ¶¶ 99–102. Additionally, around this time, "a car parked on the Castanedas' property line caught fire." *Id.* ¶ 99. Finally, Bedingfield complained only about Plaintiffs' fence, despite that fence being the same height as every other fence in the neighborhood (and not in violation of the relevant code).

findings and recommendations regarding the application. Franco Decl. Ex. 15. Fox noted that the application requested a FY variance of 10 feet (from the 20-foot standard setback) but, in Fox's opinion, "[o]therwise, the proposed project is consistent with the R-4 development standards." *Id.* 5. Fox walked through Defendant's zoning ordinances and provided findings supporting his analysis recommending that the Planning Commission approve the application.

In a tied vote of 2-2, the Planning Commission denied Better Way's application.[4] Wollenburg Decl. ¶ 13. Because the Planning Commission needed to seek legal advice on the effect of a tied vote, they voted to revisit the issue in two weeks. City Planner Fox left the first meeting somewhat confused. In Fox's professional opinion, Better Way's second application "complied with the required guidance as proposed." Franco Decl. Ex. 20, 18. Fox testified that this was the first time the Planning Commission had ever disagreed with his recommendation to grant an exception or setbacks. *Id.* 7. At the conclusion of the first meeting, City Planner Fox requested guidance from the Planning Commission on how to proceed:

> The City Planner explained that the Commission has essentially denied the project and there is no specific direction from the descending members of the Commission of changes that would sway at least one of them to vote favorably. He asked the Commission to provide specific findings of fact that the Commission is making to deny the project to be included in the Final Order. The denial must be based on the findings and his recommendation was to approve the application. He needs to know the findings they find in error and why.

Franco Decl. Ex. 6, 10.

At his deposition, Fox testified that he left the first meeting knowing that he needed to draft findings to present at the next meeting in "the most legally defensible way to support a denial." Franco Decl. Ex. 20, 14. This was a first for Fox. *Id.* 15. In fact, Fox testified that in his more than

---

[4] One commissioner recused himself because he was the geotechnical engineer/engineering geologist for Better Way's proposed home. Wollenburg Decl. Ex. C, 5.

30 years as a City Planner, this was the first time any public body: (1) disagreed with his analysis recommending a development go forward; (2) didn't provide him with any findings they disagreed with; and (3) left Fox to draft different findings supporting the denial. *Id.* 16–17.

Fox's revised report contained, in Plaintiffs' view, "reasoning that was impossible to satisfy[.]" Resp. 9. For example, the new findings recognized that "[t]he Planning Commission agrees that the apparent frequency of similar setback encroachments in the neighborhood establishes a substantial property right of the applicant, and that preserving this property right warrants granting the requested Variance to reduce the front-yard setback to a minimum of 10 feet at the closest point of the property line." Franco Decl. Ex. 5, 79. The findings later recognized that "the requested reduction of the front-yard setback is similar to with [sic] the reduced front-yard setbacks that are already present at other properties in the immediate vicinity." *Id.* Despite those findings, the Planning Commission denied the requested FY variance. *Id.* at 80.

Additionally, the Planning Commission concluded that the AVC "setback does not minimize the disruption of the visual character of the area. *Id.* Defendant's own expert, however, acknowledged that an AVC setback "typically requires shielding the proposed property from the neighbors view." Franco Decl. Ex. 19, 6. Defendant's 30(b)(6) witness later acknowledged that the footprint of Plaintiffs' proposed home "would not extend as far seaward as the homes on either side" and was "roughly in line with the home on the left and the home on the right" of the Property. Franco Decl. Ex. 20, 9–10. In Plaintiffs' view, the Planning Commission's findings and conclusions are contradictory, circular, arbitrary, and irrational. At this stage, the Court agrees.

Better Way appealed the Planning Commission's decision to the City Council. Wollenburg Decl. ¶ 15. The City Council voted four votes to three to uphold the Planning Commission's decision. Wollenburg Decl. Ex. D, 6. Councilor Recht–who ordered the Planning Commission to

deny Better Way's first application—and Councilor Bedingfield—who filed the formal (and baseless) complaint regarding the fence the Castanedas built on the Property—voted to uphold the Planning Commission's denial of the application Wollenburg Decl. *Id.* Based on the numbers, if Councilors Recht and Bedingfield had recused themselves, the City Council would have reversed the Planning Commission and approved Better Way's application.

Although Defendant argues that neither Councilor had a legal duty to recuse themselves from the appeal, Eric Freed, *Defendant's own expert*, opined: "I cannot speak to the motivations or biases of the City Councilors, but in my experience, locally elected officials typically try to avoid even the mere appearance of a conflict of interest." Franco Decl. Ex. 19, 8. Freed also watched video of the City Council meeting where Councilor Bedingfield admitted to filing the code enforcement complaint about the fence. In Freed's opinion (again, Freed is Defendant's expert) "If the implication is that this city counselor is biased against the applicant, *then a recusal would be standard practice.*" *Id.* (emphasis added). While perhaps none of the above facts on their own would support an argument that the City Council acted in an arbitrary and capricious manner, the combination of a number of unusual actions tilts the scale in Plaintiffs' favor. Additionally, as discussed below, Plaintiffs submitted an expert opinion providing further support for their theory that the City Council treated Plaintiffs differently than all other similar applicants.

Plaintiff's expert believes that the home the Castanedas proposed in their 2023 application "was reasonable, was consistent with neighboring homes, and had setbacks that were in line with the adjacent homes. The proposed home was consistent in design and size with other homes in the neighborhood and was in line with the [front yard] and AVC setbacks of the adjacent homes." *Id.* ¶ 8. The expert concluded:

13 – OPINION AND ORDER

that the Castanedas' 2023 Development Application met the criteria for granting an
exception to the AVC and for a variance to the FY setback contained in the Depoe
Bay Zoning Ordinance 152.074(B)(1)(g) and 152.171(A)-(E). I cannot recall a
single time in my career when I observed a Planning Commission reject a qualified
City Planner's recommendation and essentially do the opposite. It is extraordinary,
particularly to do so without having clearly articulated findings at the meeting when
the denial occurred.

Based upon my review of the Planning Commission's findings, conclusions and
order, I also found that the Planning Commission's findings denying the Castanedas
AVC setback exception and FY setback variance were internally inconsistent,
circular, impossible to satisfy and lacked credibility.

*Id.* ¶¶ 10–11.

In other words, Emmons agrees *with the Defendant's own City Planner*. Emmons

continues: "**I have identified no rational reason for the Planning Commission and City

Council to have overruled the City Planner's recommendations and to have denied the

Castanedas the ability to build on their vacant lot.**" Emmons Decl. Ex. 1, 4 (emphasis in

original). Emmons describes the Planning Commission's findings as a Catch 22 of sorts, where

the Commission (1) found that the home could be re-designed with more of the footprint beyond

the 40-foot AVC (i.e., by moving the home towards the street/front yard); and (2) denied the

request for a front yard variance (from 20 feet to 10 feet) because such a variance would

"contribute" to encroachment of the AVC setback (and the Commission had already decided that

no such encroachments were warranted). *Id.* ¶ 12. As Emmons describes the Commission's

findings, "as long as the Castanedas are seeking any AVC setback exception, they cannot get a FY

setback variance, even though a FY setback variance is one of the criteria that helps justify an

AVC exception in the first instance." *Id.* City Planner Fox agreed that the Planning's

Commission's findings on this point appeared to put Plaintiffs in "somewhat of a conundrum."

Franco Decl. Ex. 20, 19.

14 – OPINION AND ORDER

Emmons's declaration continues:

> I also concluded that the Planning Commission's finding that granting a 10 foot FY setback variance to the otherwise 20 foot setback would be materially detrimental to the surrounding neighborhood entirely lacks credibility. The Planning Commission already found, in another part of its findings, conclusions and order, that the Castanedas had a substantial property right to the FY variance because it was similar to other setback encroachments in the neighborhood. It is illogical and not credible to say that a FY setback variance that would position the Castanedas' home consistent with others in the neighborhood would be so offensive as to be "materially detrimental to the surrounding neighborhood, or to the purposes of the Depoe Bay Zoning Ordinance and Comprehensive Plan."

> Finally, I concluded that I would not have advised the Castanedas to reapply for permission to develop their lot, given the circular, impossible-to-meet, and not credible rationale expressed by the Planning Commission and the City Council for denying their 2023 Development Application.

Emmons Decl. Ex. 1, ¶¶ 13–14 (internal citation omitted).

Given Emmons's persuasive expert opinion—along with the seemingly bizarre decision of the Planning Commission in declining to adopt the City Planner's findings and conclusions without pointing to any findings they disagreed with—Plaintiffs have created a reasoned argument that Defendant's refusal to grant the application was arbitrary, irrational, and taken with an improper purpose. Counciler Bedingfield's baseless "Spite Fence" complaint, and the fact that Councilor Recht ordered the Planning Commission to deny Plaintiffs' 2021 application before voting herself to deny the 2023 application provides further support for Plaintiffs' Equal Protection claim.

## IV.    <u>Due Process</u>

"[T]he Substantive Due Process Clause "forbids the government from depriving a person of life, liberty or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *David Hill Dev.*, 2022 WL 5381555, at * 24 (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)). This due process component "guards against arbitrary and capricious government action, even when the decision to take that action is

15 – OPINION AND ORDER

made through procedures that are in themselves constitutionally adequate." *Halverson v. Skagit Cnty*, 42 F.3d 1257, 1261 (9th Cir. 1994). That said, substantive due process typically applies only to fundamental rights. *Id.* (citing *Albright v. Oliver*, 510 U.S. 266, 1994) (noting substantive due process rights commonly limited to "matters relating to marriage, family, procreation, and the right to bodily integrity.").

In land use cases challenging the failure to provide a building permit, a Plaintiff brining a substantive due process claim need not show "that all use of the property has been denied, but rather that the interference with property rights was irrational or arbitrary." *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (internal citation omitted). In this context, "arbitrary administration of the local regulations, which singles out one individual to be treated discriminatorily, amounts to a violation of that individual's substantive due process rights." *Id.*

The analysis described in the Equal Protection analysis above applies in the same manner here. To summarize, when viewed in the light most favorable to Plaintiffs, Defendant's denial of the 2023 application was arbitrary in that Defendant treated Plaintiff differently from all other similar landowners in the past 10 years who sought similar variances and exceptions.

## V.     <u>Monell</u>

Defendant argues that because section 1983 claims do not allow for vicarious liability, it is not liable for any actions made by the City Council. Defendant argues that "[Plaintiffs] are unable to show that the Depoe Bay City Council made a 'deliberate choice from among various alternatives' when it proceeded to vote on the Plaintiffs' application after Councilors Recht and Bedingfield declined to recuse themselves." Reply 6. Defendant later argues that the City Council did not ratify the decision of the Planning Commission "because a mere failure to overrule a subordinate's decision is not the same as adopting it." Reply 7.

16 – OPINION AND ORDER

Defendant, however, *only* acts through votes made by the City Council or actions taken by its Mayor. *Bateson v. Geisee*, 857 F.2d 1300 (9th Cir. 1988), cited by neither party, is on point and confirms that Defendant here is subject to *Monell* liability for actions taken by the City Council. Bateson wanted to build a condominium development in Montana. Bateson filed an application, but "the City Council voted to withhold issuing Bateson's building permit although all requirements had been satisfied." *Id.* at 1302. Bateson filed a 1983 action against the individual city council members and the City of Billings, alleging that Defendants violated his substantive due process rights by refusing to issue the building permit. The quotation below from *Bateson* is informative to Plaintiffs' claims here:

> The district court concluded that the apellants' refusal to issue Bateson's building permit, after Bateson had satisfied all the requirements made on the permit, was an arbitrary and capricious action which deprived Bateson of his substantive due process rights. . . . A substantive due process claim does not require proof that all use of the property has been denied, but rather that the interference with property rights was irrational or arbitrary. . . .
>
> As of June 26, 1984, Bateson had met all of the requirements necessary for the City to issue him a building permit. The City of Billings' regulations provide that once an applicant's building plans comply with the code and other applicable laws and the fees are paid, the building official must issue a building permit to the applicant. These regulations do not provide for review by the City Council before a building permit can issue. The City Council voted to withhold Bateson's building permit without providing Bateson any process, let alone "due" process. This sort of arbitrary administration of the local regulations, which singles out one individual to be treated discriminatorily, amounts to a violation of that individual's substantive due process rights. Therefore, we agree with the district court's conclusion that the appellants violated Bateson's substantive due process rights.
>
> Under 42 U.S.C. § 1983, Bateson can recover for this constitutional tort only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the local governing body's officers," *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1977), and causes the constitutional violation. In addition to seeking redress from the individual city council members for their decision to arbitrarily withhold Bateson's building permit, *"a municipality may be held liable under § 1983 for a single decision by its properly constituted*

17 – OPINION AND ORDER

*legislative body*—whether or not that body had taken similar action in the past or intended to do so in the future—*because even a single decision by such a body unquestionably constitutes an act of official government policy*."

*The individual city council members comprising the City of Billings' "properly constituted legislative body" made the single decision to withhold issuing Bateson's building permit.* Considering that this decision selected "a course of action tailored to a particular situation and was not intended to control decisions in later situations," and that it was "properly made by the government's authorized decision makers, *it surely represents an act of official government 'policy' as that term is commonly understood*."

Additionally, this municipal policy caused Bateson's injury because it was "the moving force of the constitutional violation." "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."

In this case, the city council members personally inflicted Bateson's constitutional injury. Bateson's loan commitment had been reaffirmed by the Bank in the spring of 1984 and resubmittal of the loan was not required in June of 1984 when Bateson had satisfied all of the final requirements imposed on his building permit. However, in June 1984, the City Council refused to issue Bateson his building permit and further deferred taking action on the permit on August 27, 1984. Meanwhile, in August 1984, during this delay created by the City Council, Bateson's loan commitment was reevaluated and formally withdrawn by the Bank effective December 24, 1984. The Bank foreclosed on the property and Bateson lost the equity he had invested in the property.

Accordingly, *we find that the city council's decision to arbitrarily withhold Bateson's building permit "may fairly be said to represent official policy*," *Pembaur*, 475 U.S. at 480, and acted as the "moving force" behind Bateson's constitutional injury. Consequently, the City of Billings, as well as the individual city council members, are liable for Bateson's constitutional injury.

*Id.* at 1303–04 (cleaned up) (internal citations omitted) (emphasis added).

*Bateson* forecloses Defendant's *Monell* arguments.

/ / / /

/ / / /

/ / / /

18 – OPINION AND ORDER

**<u>CONCLUSION</u>**

Because ample evidence supports Plaintiffs' argument that Defendant's decision was arbitrary and capricious, Defendant's Motion for Partial Summary Judgment, ECF No. 47, is DENIED. Plaintiffs are entitled to have a jury determine if Defendant's actions were unlawful. IT IS SO ORDERED.

DATED this 29th day of January 2026.


_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge

19 – OPINION AND ORDER